IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

HOUSING OPPORTUNITIES PROJECT
FOR EXCELLENCE, INC., and MIKEL STEPHANIE BRUCE

    Plaintiffs

vs.

HIDDEN GROVE, LTD, d/b/a HIDDEN GROVE APARTMENTS
and TRG MANAGEMENT COMPANY, LLP.

    Defendants
_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, the Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., and MIKEL STEPHANIE BRUCE by and through the undersigned counsel, hereby bring this suit for injunctive, monetary, and declarative relief against Defendants, HIDDEN GROVE, LTD, d/b/a HIDDEN GROVE APARTMENTS and TRG MANAGEMENT COMPANY, LLP., and in support states and alleges as follows:

    1.    This is an action for declaratory judgment, permanent injunctive relief, and damages against Defendants for engaging in a pattern or practice of illegal discrimination based on race in violation of the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq*.

    2.    The Plaintiff, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. (hereinafter HOPE), is a private, federally funded, fair housing, Florida not-for-profit, 501 (c) 3 corporation established in 1988, one of three in Florida dedicated to eliminating housing discrimination and promoting fair housing. HOPE employs a three-tiered system of private

enforcement, education, outreach, and counseling to achieve its mission to fight housing discrimination in Miami-Dade and Broward Counties and ensure equal housing opportunity throughout Florida. Its programs are designed to ensure that people are offered the right to select housing of their choice without discrimination based on race, religion, color, national origin, sex, disability, marital or familial status, or such other protected classes as may be conferred by federal, state or local laws. HOPE is the only private not-for-profit fair housing organization in Miami-Dade and Broward Counties engaged in testing for fair housing law violations and pursuing enforcement of meritorious claims.

3.      Plaintiff, MIKEL STEPHANIE BRUCE, (hereinafter BRUCE) is a single African-American woman who has a two-year-old son and resides in Miami-Dade County, FL and is otherwise *sui juris*.

4.      Defendant, HIDDEN GROVE, LTD (hereinafter "HIDDEN GROVE") is a Florida limited liability company, doing business in Miami-Dade Florida. HIDDEN GROVE owns and operates HIDDEN GROVE APARTMENTS, located at 13815 SW 271st Ter, Homestead, FL 33032.

5.      Defendant, TRG MANAGEMENT COMPANY, LLP., (hereinafter "TRG") is a Florida Limited Liability Partnership that is the professional apartment management division of the Related Group. TRG Management is the property manager of HIDDEN GROVE APARTMENTS and many other multifamily apartment communities in the State of Florida, with over 20,000 residential units currently under their care.

## FACTS

6.      On July 7, 2020, BRUCE called HIDDEN GROVE APARTMENTS and inquired about the availability of a two bedroom/ two-bathroom apartment.

7. At the time, she was advised by Viviana Freire, a leasing consultant at HIDDEN GROVE APARTMENTS, that a unit was available, and that BRUCE would need to fill out an application, bring IDs, Social Security Card, $85.00 application fee and $300 money order for a deposit.

8. BRUCE filled out an application for a two bedroom/two-bathroom apartment at HIDDEN GROVE APARTMENT, with her paperwork, and paid an $85.00 application fee, and paid a $350.00 deposit fee.

9. After inputting her information, Ms. Freire advised BRUCE that her application was denied, and it was either something on her credit report or her criminal record. BRUCE stated that she had a misdemeanor on her criminal record, but adjudication was withheld, and she did not have a conviction. Ms. Freire advised BRUCE that she could complain to the company that did the background search.

10. According to the Statement of Qualifications that is provided to potential applicants to HIDDEN GROVE APARTMENTS –

> **Criminal background:** Criminal background will be reviewed for all adult members of the household who have satisfactorily met all above income, credit, and rental history criteria.
>
> - A history of any criminal conviction is not a denial of a rental application in all cases; criminal history is evaluated based on the nature and time of the conviction, as well as any relevant mitigating information provided by the applicant. Criminal history screening will not consider arrests, charges, expunged convictions, convictions reversed on appeal, offenses where adjudications was withheld or deferred, pardoned convictions, vacated convictions, and sealed juvenile records.
> - Felony conviction for 1) the manufacture, sale, or distribution of a controlled substance; 2) arson; or 3) homicide will, in most cases, result in a denial of the application. Current registration as a sexual offender will result in automatic denial of the application.

- If the criminal history screening produces any relevant conviction, you will be given notice of the specific information from the screening that creates the concern and will have an opportunity to provide any additional information for us to consider in the evaluation of your application.

11. At the time, BRUCE advised the leasing agent that she did not have a conviction; notwithstanding her pleas, she was advised to complain directly to the entity that does the criminal records search for Defendant – LeasingDesk Screening.

12. Ms. Bruce contacted LeasingDesk by telephone shortly after she was denied housing at HIDDEN GROVE to determine the reasons why she was disqualified from housing. Ms. Bruce desired to obtain this information so she could request that HIDDEN GROVE would approve her tenancy.

13. BRUCE called LeasingDesk Screening and explained that adjudication was withheld on misdemeanor trespass and that she did not have a criminal record. The person at LeasingDesk insisted that the personnel at HIDDEN GROVE should be calling them, and not BRUCE.

14. BRUCE contacted her public defender and received records demonstrating that her misdemeanor adjudication was withheld and filed an appeal of her criminal record determination with LeasingDesk demonstrating the state of her criminal record.

15. Notwithstanding her proffer to LeasingDesk, they sent a letter on July 17, 2020 indicating that the record for her criminal record was derived from the public records and was accurate. The records demonstrated that she was arrested for misdemeanor trespass which resulted in a withhold of adjudication and resisting officer without violence, in which this charge was *nolle prossequi*.

16. On July 28, 2020, BRUCE called HIDDEN GROVE again and again stated that she did not have a criminal conviction, and a TRG manager at HIDDEN GROVE advised her that she was denied because of her criminal record. She then advised that BRUCE that she could not live in HIDDEN GROVE and could only re-apply if she expunged her record.

17. BRUCE complained to HOPE, Inc., and HOPE sent a series of testers to HIDDEN GROVE to determine their leasing practices.

18. HOPE also advocated on Ms. Bruce' behalf to Defendants regarding their unfair screening practices.

19. During this time, BRUCE and her infant were homeless, and resorted to sleeping on a family member's couch.

20. Due to HOPE's demand and advocacy Defendants decided that their practice was in error and allowed Ms. BRUCE to rent a unit at HIDDEN GROVE beginning in November 2020.

**Defendants Screening Practices**

21. Upon information and Belief, Defendants use LeasingDesk by Real Page to screen applications for potential residents.

22. LeasingDesk Resident Screening reports enable landlords and property management companies to access a rental payment history database and an in-depth criminal background and rental credit checks.

23. The residential screening report returns a single-score result in a "pass-fail" format—based on credit, criminal, sex offender, rental history, evictions, and predictive end-of-lease cost—in just seconds.

24. Part of the LeasingDesk software allows a property management company to purchase a premium feature that automatically classifies criminal offenses into 34 categories based on their nature/type and severity. As such, a management company can specify, through scoring model settings, how to treat each offense, based on not only the nature/type and severity of the offense but also the degree and/or age of the offense.

25. The Defendants either did not purchase the premium feature from LeasingDesk or purchased the premium feature in which the severity of a criminal record could be set, and did not set such system to only **include** felony conviction for 1) the manufacture, sale, or distribution of a controlled substance; 2) arson; or 3) homicide, and **exclude** arrests, charges, expunged convictions, convictions reversed on appeal, offenses where adjudications was withheld or deferred, pardoned convictions, vacated convictions, and sealed juvenile records.

26. Defendant also did not provide LeasingDesk with any information that would have allowed LeasingDesk to take these factors into account to determine whether Ms. Bruce's criminal record was "disqualifying." Nor did Defendant advise LeasingDesk that their determination on the criminal record check was incorrect or did not meet their occupant policies.

27. Furthermore, Defendant failed to train their employees or managers as to the specific circumstances on a criminal record that would be disqualifying to a tenant, but instead provides their employees and managers with an immense degree of subjective determination as to when, and what types of adjudication or criminal records would result in a denial of tenancy.

28. In determining that Ms. Bruce's arrest record disqualified her from living at HIDDEN GROVE, Defendants did not take into account the fact that there were no convictions against Ms. Bruce, the nature or recency of Ms. Bruce's arrest, the outcome of the case, the facts

or circumstances surrounding the alleged criminal conduct, or any other factor related to whether Ms. Bruce (or her infant) posed any actual threat to safety or property.

29. Had Defendant appropriately screened Ms. Bruce, she would have been able to move into HIDDEN GROVE in July 2020. As a result of Defendants' actions and its determination that his criminal record disqualified her from tenancy, Ms. Bruce and her infant were homeless for almost four months.

30. Defendant's policy or practice of making automated determinations or subjective determinations, without individualized assessments, that applicants are disqualified from rental housing because of the existence of a criminal record has an unlawful disparate impact on African Americans.

31. African Americans are arrested, convicted, and incarcerated at rates disproportionate to their share of the general population.[1] This is true nationally, and in Florida where Ms. Bruce lives. Defendant's policy of disqualifying people from rental housing based solely on the existence of a charge or conviction record has a predictable disparate impact on African Americans.

32. In April 2016, the U.S. Department of Housing and Urban Development (HUD) issued guidance on the application of Fair Housing Act standards to the use of criminal records in housing-related activities. Specifically, the guidance addresses disparate impact liability when an individual's criminal history forms the basis for an adverse housing action, such as a refusal to rent.

---

[1] See generally U.S. Dep't of Housing & Urban Dev., Office of General Counsel, Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-related Transactions (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF [hereinafter "HUD Guidance"].

33. HUD determined by analyzing national criminal records data that a policy that restricts access to housing solely because of a criminal record has a discriminatory effect because it disproportionately harms African American applicants.[2]

34. African Americans are more likely than whites to be arrested, charged with a crime, convicted, and incarcerated.[3] As HUD notes, more than 100 million people are estimated to have a criminal record of some kind,[4] and more than 2.2 million people are currently incarcerated, with an average of 650,000 people released each year.[5] These individuals are disproportionately African- American and Latino.

35. Nationally, African Americans are incarcerated at more than five times the rate of whites.[6]

36. African Americans comprise 36% of U.S. prisoners but only 12% of the total population. By contrast, 34% of prisoners are white even though whites represent 62% of the total U.S. population.[7]

37. Racial and ethnic disparities among prisoners are even more pronounced in Miami-Dade, where HOPE operates, and Ms. Bruce lives.

---

[2] HUD Guidance at 2-4

[3] *Id.* at 2-3.

[4] *Id.* at 1 (citing Bureau of Justice Statistics, U.S. Dep't of Justice, *Survey of State Criminal History Information Systems*, 2012, at 3 (Jan. 2014), https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf

[5] *Id.* (citing E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at 29, Appendix tbls. 1 and 2, http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387 )

[6] The term "white" is used herein to describe non-Hispanic whites

[7] *See supra* note 12.

38. In Miami-Dade, African Americans are incarcerated at 2.5 times the rate of whites, and 46% of all defendants in criminal proceedings are Black.[8]

39. One out of every three African-American males in the U.S. can expect to go to prison at some point in his lifetime. By contrast, only one in 17 white males can expect the same fate.[9] In other words, African-American males are six times more likely than white males to be incarcerated.

40. Over 95 percent of inmates are eventually released.[10] As HUD notes, when these individuals, who are disproportionately African-American and Latino, are released from prisons and jails, their ability to access safe and affordable housing is critical to their successfully re-entry, yet they encounter significant barriers to securing housing because of their criminal histories.[11]

41. HUD further explains that individuals who are convicted of crimes but never incarcerated, and even those who are arrested and/or charged but never convicted, also face significant barriers to securing housing.[12] These individuals are also disproportionately African- American.

---

[8] Research Report: Unequal Treatment: Racial and Ethnic Disparities in Miami-Dade Criminal Justice, found at https://www.aclufl.org/sites/default/files/6440miamidadedisparities20180715spreads.pdf

[9] The Sentencing Project, *Report of The Sentencing Project to the United Nations Human Rights Committee Regarding Racial Disparities in the United States Criminal Justice System*, at __ (Aug. 2013), http://sentencingproject.org/wp-content/uploads/2015/12/Race-and-Justice-Shadow-Report-ICCPR.pdf.

[10] Bureau of Justice Statistics, U.S. Dep't of Justice, *Reentry Trends in the United States*, at 1, http://www.bjs.gov/content/pub/pdf/reentry.pdf.

[11] HUD Guidance at 1-2.

[12] *Id.*

42. Nationally, African Americans and Latinos are arrested at a rate that is two to three times their proportion of the general population.[13] Overall, African Americans are arrested at a rate of more than double their share of the general population.[14] African American comprise 42% of all arrestees in Miami-Dade but only 18% of the total population.[15]

43. One of the most common ways that the public interacts with police is during traffic stops, with an estimated 20 million Americans stopped each year for traffic violations.[16] Nationally, African-American drivers are stopped at nearly 1.5 times the rate of white drivers. African- American drivers are approximately twice as likely as white drivers to be searched and arrested during traffic stops.[17]

44. As a result of these clear racial disparities, African Americans are much more likely than whites to have criminal records that appear in LeasingDesk's national database. Consequently, they are disproportionately likely to be denied housing when Defendant reports to housing providers that their criminal records are disqualifying.

45. A policy that has a disparate impact may be permissible under the Fair Housing Act if it is necessary to achieve a legitimate business interest, and there is no less discriminatory alternative that would achieve that interest. Defendant's use of arrests and/or charges, without

---

[13] *See* U.S. Equal Employment Opportunity Commission, *EEOC Enforcement Guidance*, Number 915.002 (Apr. 25, 2012), http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm [hereinafter EEOC Guidance].

[14] *See* HUD Guidance at 3 (citing See FBI Criminal Justice Information Services Division, *Crime in the United States*, 2013, tbl.43A, available at: https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-43 (Fall 2014)).

[15] https://metropolitan.fiu.edu/research/periodic-publications/hot-topics/racial-disparities-graphic.pdf

[16] Emma Pierson, et al., *A Large-Scale Analysis of Racial Disparities in Police Stops across the United States*, at 1 (2017), https://5harad.com/papers/traffic-stops.pdf

[17] *Id*

convictions, to determine that applicants, including Ms. Bruce, are disqualified from rental housing cannot be justified by a legitimate business purpose. The fact of an arrest does not constitute proof of past misconduct[18]. and is not a reliable basis upon which to evaluate the potential risk to resident safety or property.[19] Defendants' disqualification decision based on a prior arrest are also not necessary to achieve the goal of improving safety because they fail to consider information about the nature, seriousness, type, or recency of the underlying offense or information about what the applicant has done since the conviction.[20]

46. By adequately training their employees to conduct an individualized assessment into each applicant's criminal history, Defendant could achieve any legitimate business interest such as protecting resident safety and property. This approach would have a less discriminatory effect because fewer African-American would be disqualified from rental housing when, like Ms. Bruce, they present no realistic risk to safety or property.

47. Defendant's policy or practice of declaring applicants disqualified for rental housing based on criminal records also constitutes intentional discrimination based on race. Defendant's discriminatory intent can be inferred because, upon information, it is aware of the overwhelming racial and ethnic disparity among those with criminal records, and of the obvious less discriminatory alternatives.

48. Defendant's discriminatory tenant screening product, including its disqualification of housing applicants with criminal records without individualized consideration, and the

---

[18] *See also* <u>Schware v. Bd of Bar Examiners</u>, 353 U.S. 232, 241 (1957) (explaining "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense.").

[19] *See* HUD Guidance at 5.

[20] *Id.*

disparate impact its policies and practices have on African-American applicants, frustrate HOPE's mission of eliminating housing discrimination and ensuring that all people have mission of eliminating housing discrimination and ensuring that all people have equal access to the housing of their choice. To counteract this frustration of its mission, HOPE had to divert its scarce resources to confront Defendant's discriminatory actions.

49. Upon information, Defendant is aware of the HUD guidance on the use of the criminal records in tenant screening decisions; of the overwhelming racial and ethnic disparities in the criminal justice system and consequently the discriminatory effect of automatic disqualification; and of the obvious less discriminatory alternatives of doing individualized assessments or providing sufficient information to housing providers to allow them to do so. Defendant's discriminatory intent can be inferred from the fact that, despite this knowledge, it continues to offer a screening service to housing providers that, without justification, adversely harms African Americans.

50. Defendant's discriminatory criminal records screening causes significant harm both in the sheer number of people affected and in terms of the consequences for individuals reentering society and the well-being of our communities. At the same time as the number of individuals with criminal records has skyrocketed, it has become significantly easier to identify and ban people with criminal records because of companies, like LeasingDesk, which provide near-instant background checks based on databases from multiple data sources.[21] Indeed, in 2005, 80% of members of the National Multi-Housing Council, which is comprised of large rental

---

[21] *See* Rebecca Oyama, *Do Not (Re)enter: The Rise of Criminal Background Tenant Screening As A Violation of the Fair Housing Act*, 15 Mich. J. Race & L. 181, 187 (2009)(explaining that people with criminal records now face "unprecedented stigmatization" because of technological advances in commercial background checks).

HOPE, Inc. and Bruce v. Hidden Grove
Complaint

companies, reported that they screenprospective tenants for criminal history,[22] and that number is likely even higher today.

51. The harm to these individuals, their families, and the well-being of our society cannot be overstated. As HUD has recognized, "[w]hen individuals are released from prisons and jails, their ability to access safe, secure, and affordable housing is critical to their successful reentry to society."[23]

52. Researchers have explained "how the increasing numbers of people leaving carceral institutions face an increased risk for homelessness and, conversely, how people experiencing homelessness are vulnerable to incarceration."[24] Research has also found a causal link between a former prisoner's ability to find stable housing and the likelihood of reoffending.[25]

53. Defendant's discriminatory tenant screening product, including its disqualification of housing applicants with criminal records without individualized consideration and the disparate impact its policies and practices have on African-American applicants and applicants with disabilities frustrate HOPE's mission of eliminating housing discrimination and ensuring that all people have equal access to the housing of their choice.

54. Defendants' failure to adequately screen its applicants with any form of criminal history has made it substantially more difficult for Florida residents with criminal records, who

---

[22] David Thacher, *The Rise of Criminal Background Screening in Rental Housing*, 33 Law & Soc. Inquiry 5, 12 (2008).

[23] HUD Guidance at 1.

[24] Stephen Metraux, et al., *Incarceration and Homelessness*, 2007 National Symposium on Homelessness Research, at __, https://www.huduser.gov/portal//publications/pdf/p9.pdf.

[25] Caterina Gouvis Roman and Jeremy Travis, The Urban Inst., *Taking Stock: Housing, Homelessness, and Prisoner Reentry*, at 7-10 (Mar. 8, 2004), *available at* http://www.urban.org/publications/411096.html.

are disproportionately African American, to find safe and affordable housing, directly and significantly frustrating HOPE's mission of eliminating discriminatory barriers and ensuring equal housing opportunities for all.

55. To counteract this frustration of its mission, HOPE has had to divert its scarce resources to confront Defendants' discriminatory actions.

56. As a direct result of Defendant's actions, HOPE diverted resources from other activities in order to investigate Defendant's conduct and assist individuals who have been denied housing as a result of its actions, including Ms. Bruce.

57. As a result of diverting its resources to address Defendant's discriminatory conduct, HOPE has been unable to devote as much time and resources to other activities, including education and outreach aimed at other protected classes and direct assistance to individuals who experience housing discrimination.

58. Until Defendant's unlawful, discriminatory conduct permanently ceases, its actions with continue to injure HOPE by, *inter alia*:

    a. interfering with its efforts intended to ensure equal access to housing;

    b. requiring the commitment of its scarce resources, including staff time and funding, to investigate and counteract Defendant's discriminatory conduct, thus diverting those resources away from HOPE's other activities and services; and

    c. frustrating HOPE's mission to ensure that all residents have access to the housing of their choice, free from discrimination.

**CAUSES OF ACTION**
**COUNT I: National Origin Discrimination in Violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.***

**(on behalf of all Plaintiffs)**

59. Plaintiffs repeat and re-allege paragraphs one to 58 of the Complaint as though fully set forth herein.

60. Defendant's policies and practices of criminal screening have a disproportionate adverse impact on African Americans as compared to similarly situated whites. This disproportionate impact is the direct result of Defendants' tenant screening that automatically and without an individualized assessment determines and reports to a housing provider that an applicant is disqualified for rental housing based on the existence of a criminal record. This policy is not necessary to achieve any substantial, legitimate, nondiscriminatory interest.

61. Defendant's policies and practices have the intention to discriminate based on race. Defendant is aware of the overwhelming disparate impact of automatic disqualification of applicants with criminal records and of the less discriminatory alternatives, yet it continues to denies housing to African Americans based upon subjective determinations of criminal records.

62. Defendant's policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by:

   a. making housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and

   b. providing different terms and conditions and discriminating in the provision of services in connection with housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

63. Plaintiffs have been injured by Defendant's discriminatory conduct and suffered damages as a result.

HOPE, Inc. and Bruce v. Hidden Grove
Complaint

64. Defendant's conduct was intentional, willful, and made in reckless disregard for the known rights of others.

WHEREFORE, Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. demands judgment against the Defendants, HIDDEN GROVE, LTD, d/b/a HIDDEN GROVE APARTMENTS and TRG MANAGEMENT COMPANY, LLP, to enjoin Defendants from discriminating against Plaintiffs and award appropriate injunctive relief, compensatory, punitive damages, and attorneys' fees and costs.

PLAINTIFFS DEMAND A TRIAL BY JURY FOR ALL ISSUES FOR WHICH A TRIAL BY JURY IS PERMITED.

Respectfully submitted this 26th day of March, 2021

By: */s/ Matthew W. Dietz*
MATTHEW W. DIETZ, ESQ.
Florida Bar No.: 0084905
Disability Independence Group, Inc.
2990 Southwest 35th Avenue
Miami, Florida 33133
Tel: (305) 669-2822
Fax: (305) 442-4181
Mdietz@justDIGit.org
 aa@justdigit.org

*Counsel for Plaintiff*

By: */s/ J. Courtney Cunningham*
J. Courtney Cunningham, Esq.
FBN: 628166
J. COURTNEY CUNNINGHAM, PLLC
8950 SW 74th Court, Suite 2201
Miami, FL 33156
T: 305-351-2014
cc@cunninghampllc.com

*Counsel for Plaintiff*